# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

U.S. Bank National Association,

                         Plaintiff,

                                                   Case No. 10-CV-04881 (DWF/LIB)

v.

Polyphase Electric Company;
Frances F. Harkonen;
Timothy W. Harkonen;
Wesley S. Harkonen; and
W. Scott Harkonen as Trustee for the
W. Scott Harkonen Living Trust,

                         Defendants.

---

W. Scott Harkonen as Trustee for the
W. Scott Harkonen Living Trust; and
Wesley S. Harkonen,

                         Cross Claimants,

v.

Frances F. Harkonen;
Timothy W. Harkonen; and
Polyphase Electric Company,

                         Cross Defendants.

---

# U.S. Bank National Association's
# Memorandum of Law In Support of Its Motion for Summary Judgment

---

## INTRODUCTION

U.S. Bank National Association loaned nearly $2 million to Polyphase Electric Company. Members of the Harkonen family (which owns Polyphase) signed guaranties promising to repay Polyphase's debt themselves if Polyphase failed to do so.

Polyphase admits that it failed to repay its debt to U.S. Bank. But instead of making good on their written guaranties to repay Polyphase's debt, the Harkonens have steadfastly refused to pay, relying on various excuses. Wesley Harkonen alone invokes 19 affirmative defenses, and asserts cross-claims against his mother and brother, to boot.

Courts have not taken kindly to this "laundry-list" approach to affirmative defenses, dubbing the practice everything from "not particularly constructive"[1] to "press[ing] up against the boundaries of the attorney's duties under Rule 11."[2] Other federal courts have deplored the practice as well.[3] Simply reciting every defense you can think of and hoping that one of them might stick is not an acceptable approach to defending litigation.

And like most scattershot affirmative defenses, the ones here simply do not work, as the Harkonens waived many of the defenses in their written guaranties, and the remainder fail as a matter of law on the undisputed facts. The simple undisputed facts remain that Polyphase admittedly has not paid its debt, and the Harkonens have refused

---

[1] *Claisse v. The Boeing Co.*, 2009 WL 2916828, at *2 (N.D. Ill. Sept. 2, 2009).

[2] *Facebook, Inc. v. ConnectU LLC*, 2007 WL 2349324, at *1 (N.D. Cal. Aug. 14, 2007).

[3] *See also Unicredit Bank AG v. Bucheli*, 2011 WL 4036466, at *5 n.3 (D. Kan. 2011) ("an answer still may not simply contain a laundry list of boilerplate defenses"); *Fusion Capital Fund II, LLC v. Millenium Holding Group, Inc.*, 2008 WL 719247, at *2 (N.D. Ill. Mar. 14, 2008) (striking answer and commenting that "it will not do for defense counsel to set out a laundry list of affirmative defenses").

to make good on their promises to pay the debt in Polyphase's stead. Therefore, U.S. Bank is entitled to summary judgment on its claims against all of the defendants.

## FACTS

Polyphase Executes a Revolving Note and Term Note

Polyphase admits the following facts in its Answer to U.S. Bank's Complaint (Dkt. 34.)

On October 28, 2003, Polyphase executed a revolving-credit note in the principal amount of $1,250,000 ("Revolving Note"). (Complaint (hereinafter, "Dkt. 1") at ¶ 9 & Ex. A; Dkt. 34 at ¶ 2.)[4] The Revolving Note is governed by the terms of a Revolving Credit Agreement. (Dkt. 1 at ¶ 10 & Ex. B; Dkt. 34 at ¶ 2.) After several amendments, the Revolving Note allowed for a maximum outstanding principal amount of $1,649,835. (Dkt. 1 at ¶¶ 11, 14 & Exs. C, E; Dkt. 34 at ¶ 2.) Polyphase and U.S. Bank also amended the Revolving Note's maturity date, making the entire principal amount, together with all unpaid interest, fees, and other charges, due on May 20, 2010. (*Id.*)

Polyphase borrowed an additional $300,000 from U.S. Bank and executed a separate Installment or Single Payment Note dated March 8, 2007 ("Term Note"). (Dkt. 1 at ¶ 12 & Ex. D; Dkt. 34 at ¶ 2.) In 2009, the parties amended the Term Note, changing its maturity date to December 20, 2009, at which time the entire outstanding principal balance together with accrued and unpaid interest, late fees, and other charges became due and payable in full. (Dkt. 1 at ¶ 15 & Ex. E; Dkt. 34 at ¶ 2.)

---

[4] Exhibits A through K are appended to U.S. Bank's Complaint (Dkt. 1) and are filed herewith for ease of reference.

<u>Polyphase Executes Security Agreements in Favor of U.S. Bank</u>

Polyphase also admits in its Answer to U.S. Bank's Complaint that between March 2002 and August 2003, Polyphase executed 12 security agreements (collectively, the "Security Agreements") to secure performance of its obligations under the Revolving Note and the Term Note. (Dkt. 1 at ¶ 16 & Ex. F; Dkt. 34 at ¶ 2.) The Security Agreements gave U.S. Bank a security interest in essentially all of Polyphase's assets, then owned or later acquired. (Dkt. 1 at ¶ 17 & Ex. F; Dkt. 34 at ¶ 2.)

<u>Frances and Timothy Harkonen Personally Guarantee Polyphase's Repayment of the Notes</u>

Frances and Timothy Harkonen each personally guaranteed the Revolving Note and Term Note by executing and delivering 10 Continuing Guaranties (Unlimited) each to U.S. Bank (the "Frances Guaranties" and the "Timothy Guaranties"). (Dkt. 1 at Exs. H, I.) Under these guaranties, Frances and Timothy[5] each broadly promised that if Polyphase failed to do so, they would satisfy "all loans, drafts, overdrafts, checks, notes, and all other debts, liabilities and obligations of every kind owing by [Polyphase] to the Bank, whether direct or indirect, absolute or contingent, liquidated or unliquidated . . . and whether existing now or in the future, including interest thereon and all costs, expenses and reasonable attorneys' fees (including fees of inside counsel) paid or incurred by the Bank at any time before or after judgment in attempting to collect on any of the forgoing . . . ." Their guaranties also state that U.S. Bank may demand payment and impose liability

---

[5] Because there are three members of the Harkonen family involved in this case, U.S. Bank will refer to them by their first names, rather than as "Mr. Harkonen" or "Ms. Harkonen," when it is necessary to distinguish them. U.S. Bank apologizes for any seeming informality in doing so.

on one guarantor without first having to collect from Polyphase or another guarantor. (*Id.*)

Frances and Timothy admit in their answer to U.S. Bank's Complaint that each of them executed the 10 Continuing Guaranties. (Dkt. 1 at ¶¶ 20-21; Dkt. 34 at ¶¶ 5-6.)

Wesley Harkonen Personally Guarantees Polyphase's Repayment of the Notes

Wesley Harkonen (Frances's son and Timothy's brother) also personally guaranteed Polyphase's liability and obligations. He executed two Continuing Guaranties (Unlimited), each dated as of October 28, 2003, and six Reaffirmations of Guaranties (the "Wesley Guaranties"). (Dkt. 1 at Ex. J.) As with the Frances Guaranties and the Timothy Guaranties, the Wesley Guaranties guaranteed prompt payment of "all existing and future obligations" of Polyphase. (*Id.*)

The Trust Pledge and Trust Guaranty

In 2007, at the time U.S. Bank extended the additional credit to Polyphase under the Term Note, Wesley Harkonen also executed and delivered two additional guaranties in his capacity as trustee for the W. Scott Harkonen Living Trust (the "Trust"). He executed a Possessory Collateral Pledge Agreement (Limited Obligations), dated as of March 13, 2007, in favor of U.S. Bank as further security for Polyphase's obligations under the Term Note (the "Trust Pledge"). (Dkt. 1 at Ex. G.) The Trust Pledge secured all of Polyphase's obligations up to $300,000, together with unpaid interest, fees, and attorneys' fees. (*See id.*) Wesley also gave U.S. Bank a security interest in certain assets of the Trust, including a Charles Schwab brokerage account. (*Id.*) He also executed a Specific Transaction Guaranty dated as of March 8, 2007 (the "Trust Guaranty"),

guaranteeing prompt payment of any outstanding debt under the Term Note, as well as any indebtedness related to the Term Note. (Ex. K.)[6]

Polyphase Defaults on the Revolving Note and Term Note

Polyphase admits in its answer that the Revolving Note and Term Note matured and their balances became due and payable in full on May 20, 2010, and December 20, 2009, respectively. (Dkt. 1 at ¶¶ 24-27 & Ex. E; Dkt. 34 at ¶ 2.) Polyphase also admits that it has failed to pay U.S. Bank any of the amounts due under either note. (Dkt. 1 at ¶ 29; Dkt. 34 at ¶ 2; Declaration of Thomas A. Lee ("Lee Decl." ¶¶ 8, 9).) Polyphase admits that under the express terms of both the Revolving Note and the Term Note, its failure to pay the debts when they came due constitutes an event of default. (Dkt. 1 at ¶¶ 25, 27 & Exs. A, B, and D; Dkt. 34 at ¶ 2.)

On July 8, 2010, U.S. Bank sent all of the defendants written notice of Polyphase's defaults under the Revolving Note and the Term Note, and demanded that they pay the outstanding principal balance of both Notes, together with accrued and unpaid interest, late fees, and other charges, by 4:00 p.m. Central Time on July 16, 2010. (Dkt. 1 at ¶ 28; Dkt. 34 at ¶ 2; Lee Decl., Ex. L.) All four of the defendants (*i.e.*, Polyphase and the three Harkonens) admit that they failed to pay any amounts due under either Note. (Dkt. 1 at ¶ 29; Dkt. 10 at ¶ 28 (Wesley Harkonen); Dkt. 34 at ¶ 2 (Polyphase, Frances, and Timothy).)

---

[6] The Trust Pledge and Trust Guaranty are governed by California law. (Exs. K & G.)

Amounts Due

As of December 29, 2011, the principal amount due under the Revolving Note is $1,478,779.42, accrued and unpaid interest totaled $301,300.48, and late fees totaled $81,491.76. (Lee Decl. ¶ 11.)  Interest continues to accrue on the Revolving Note at the daily rate of $421.05. (*Id.*)

As of that same date, the principal amount due under Term Note is $300,000.00, accrued and unpaid interest totaled $63,997.92, and late fees totaled $15,000.00. (*Id.* at ¶ 12.) Interest continues to accrue under the Term Note at the present daily rate of $85.42. (*Id.*)

## ARGUMENT

This is a simple case. Polyphase has admitted that it did not repay its debts to U.S. Bank, and it is undisputed that the Harkonens did not repay Polyphase's debts in its stead as clearly agreed under their numerous guaranties. Polyphase asserts no defense to its failure to repay its debts, so U.S. Bank is entitled to summary judgment against Polyphase without ado. As for the Harkonens, Minnesota law is clear: "When two competent parties who can readily read and write, sign a guaranty agreement and the plaintiff on the basis of the guaranty extends credit to the other defendant, there is nothing left for a Court to do but find a judgment against such guarantors." *Midway Nat'l Bank v. Gustafson*, 165 N.W.2d 218, 222 (Minn. 1968) (quoting *Watkins Prods., Inc. v. Butterfield,* 144 N.W.2d 56, 58 (Minn. 1966). And this applies specifically to the enforcement of a guarantor's waiver of defenses, even where the guarantor has "bargained away practically every right which they now advance . . . ." *Id.* That is the

7

case here. The Harkonens assert scattershot defenses, but none of them are legally valid under the written documents that they signed. Thus, U.S. Bank is entitled to summary judgment against the Harkonens as well.

**I.    U.S. Bank Is Entitled To Summary Judgment Against Polyphase Because Polyphase Admits That It Failed To Repay Its Debts To U.S. Bank And Asserts No Defense That Would Excuse Its Repayment**

Polyphase admits in its Answer that it breached its contract with U.S. Bank by failing to repay the outstanding balance of the Revolving Note and Term Note together with accrued and unpaid interest and other fees when those amounts became due and payable. (Dkt. 1 at ¶¶ 32 & 35; Dkt. 34 at ¶ 2.) Polyphase also forthrightly admits that it is liable to U.S. Bank for the entire principal balance of the loans, plus interest and other amounts. (Dkt. 1 at ¶¶ 33 & 36; Dkt. 34 at ¶ 2.) Thus, U.S. Bank's claim against Polyphase is uncontested.

The only defense that Polyphase asserts is the boilerplate defense that U.S. Bank failed to state a claim. (Dkt. 34 at ¶ 27.) That "defense" is frivolous in light of Polyphase's concession that it breached its contract and owes U.S. Bank money.

Because Polyphase admits its breaches and liability to U.S. Bank, U.S. Bank is entitled to summary judgment on its claims against Polyphase. It is undisputed that as of December 29, 2011, Polyphase owes U.S. Bank a total of $2,240,569.58, including interest and late fees. (Lee Decl. ¶ 13.) U.S. Bank is entitled to judgment in that amount.

**II.    U.S. Bank Is Entitled To Summary Judgment On Its Claims Against Frances And Timothy Harkonen Because It Is Undisputed That They Failed To Perform Their Guarantees And They Have No Legally Valid Defense**

Frances and Timothy Harkonen admit that each of them executed 10 Continuing

8

Guaranties to secure Polyphase's repayment of its debts to U.S. Bank. (Dkt. 1 at ¶¶ 20-21; Dkt. 34 at ¶¶ 5-6.) Each of the 20 guaranties provides on its face that Frances and Timothy guaranteed all present and future obligations that Polyphase owed to U.S. Bank. (Exs. H & I; Dkt. 34 at ¶¶ 5-6.) And Frances and Timothy admit that they failed to pay the amounts due under the Revolving Note and Term Note after Polyphase defaulted on its obligations. (Dkt. 1 at ¶ 29; Dkt. 34 at ¶ 2.) Thus, "there is nothing left for [the] Court to do but find a judgment against [each of the] guarantors." *Gustafson*, 165 N.W.2d at 222.

Frances and Timothy assert two defenses in their answer to the Complaint. The first is the same boilerplate defense that Polyphase asserted: failure to state a claim. This defense is frivolous in light of Frances's and Timothy's concessions that they signed the guaranties and failed to pay U.S. Bank in Polyphase's stead as the guaranties required. Those admissions certainly give U.S. Bank a legally-viable claim under Rule 8 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)—indeed, U.S. Bank maintains in this motion that those admissions give U.S. Bank a meritorious claim. The defense is also procedurally frivolous. While a defendant may preserve its right to bring a motion to dismiss for failure to state a claim by alleging it as an affirmative defense, the defendant must still make the motion. *See, e.g.*, *Ali v. Frazier*, 575 F. Supp. 2d 1084, 1089 (D. Minn. 2008) (Schiltz, J.). Defendants obviously have not brought a motion to dismiss for failure to state a claim, nor have they provided any allegations in support of their assertion. Thus their formulaic and unsupported defense is invalid.

Frances's and Timothy's second defense is that the guaranties are invalid because

9

they were not executed by U.S. Bank. (Dkt. 34 at ¶ 28.) This defense fails as a matter of law. The Supreme Court of Minnesota held long ago that a creditor's extension of credit sufficiently demonstrates the creditor's assent to and acceptance of a guaranty, and that formal notice of the creditor's acceptance of the guaranty (such as the creditor's signature on the guarantee) is not required. *Midland Nat'l Bank v. Security Elevator Co.*, 161 Minn. 30, 200 N.W. 851, 853-54 (1924); *see also Southdale Ctr., Inc. v. Lewis,* 260 Minn. 430, 438 (1961); *State Bank of Cologne v. Schrupp*, 408 N.W.2d 686, 688 (Minn. Ct. App. 1987); *Grabill Cabinet Co. v. Sullivan*, 919 N.E.2d 1162, 1166-67 (Ind. Ct. App. 2010) ("[lender's] failure to sign the guaranty does not render it invalid"). *Midland* observed that a guaranty is a form of unilateral contract, in which the guarantor offers to guarantee a debt and the creditor accepts the offer by the act of extending credit, not by signing the document. *Midland*, 200 N.W. at 853-55. Even contracts for the sale of real estate are enforceable without two signatures, as long as the party to be bound signed the contract. *See, e.g., Krohn v. Dustin*, 172 N.W. 213 (Minn. 1919). The parties to be bound in this case—Frances and Timothy—executed the guaranties, and that is all that matters under the law.

Frances and Timothy Harkonen have no valid defense to the enforcement of their guaranties. Thus, U.S. Bank is entitled to summary judgment against each of them (jointly and severally) in the amount of $2,240,569.58 as a matter of law and undisputed fact.

III.   **U.S. Bank Is Entitled To Summary Judgment On Its Claims Against Wesley Harkonen Because It Is Undisputed That He Failed To Perform His Guarantees And He Has No Legally Valid Defense**

Like his mother and brother, Wesley Harkonen personally guaranteed Polyphase's obligations to U.S. Bank. (Exs. J & K.) Wesley grudgingly concedes in his Amended Answer and Crossclaim that he executed "a number of documents relating to loans made by U.S. Bank, and that one or more of those documents may have been in the nature of a guaranty." (Dkt. 10 at ¶ 22.) That's being cute: Wesley's two Continuing Guaranties, six Reaffirmations of Guaranties, and Trust Guaranty (Dkt. 1 at Exs. J & K) are not just "in the nature of a guaranty," they <u>are</u> guaranties, period. Also like his mother and brother, Wesley promised in his guaranties to satisfy all of Polyphase's present and future obligations, including the payment of any interest, costs, and attorneys' fees, if Polyphase failed to do so. (*Id.*) And like his mother and brother, Wesley concedes that he has not paid anything to U.S. Bank under any of the guaranties that he signed. (Dkt. 10 at ¶¶ 28 & 29.)

Despite conceding that a debt exists, that he signed multiple guaranties securing the debt, that the debtor defaulted on the debt, and that he has not made payment under the guaranties, Wesley raises <u>19</u> defenses to U.S. Bank's claims to enforce his contractual obligations. (Dkt. 10 at ¶¶ 33-51.) All of the defenses fail as a matter of law.

U.S. Bank starts with an obvious point: Wesley bears the burden of proof on all of his defenses. *See, e.g., Den Mar Construction Co. v. American Ins. Co.*, 290 N.W.2d 737, 742-43 (Minn. 1979). Thus, U.S. Bank does not have to <u>disprove</u> his defenses; Wesley has to prove them. But it turns out that U.S. Bank <u>can</u> disprove Wesley's defenses

11

because all of them fail as a matter of law and the documents that Wesley himself signed.

U.S. Bank also notes at the outset that it disregards any distinction between Wesley acting in his "individual capacity" and in his "capacity" as trustee of the W. Scott Harkonen Living Trust. A trust is not a juridical entity that can sue and be sued. *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458 (1980); *First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.*, 351 F.3d 810, 814 (8th Cir. 2003). It is instead simply a "collection" of property that is subject to the control of—and legally owned by—a trustee. *Id.* Thus, Wesley is the real party in interest with respect to the trust. *Id.*

### A.     Fraud and Fraudulent Inducement (First Affirmative Defense)

Wesley alleges "fraud and/or fraudulent inducement" in connection with his signing of the guaranties. (Dkt. 10 at ¶ 33.) Although not specifically identified in his First Affirmative Defense, it appears that Wesley relies upon the following alleged misrepresentations in support of his defense:

1.   U.S. Bank had superior knowledge of Polyphase's financial condition, but failed to disclose that information to him. (Dkt. 10 at ¶¶ 2-8, 11-16.)

2.   Wesley's mother, Frances Harkonen, and his brother, Timothy Harkonen, misrepresented to him that Polyphase was in "good financial shape," which induced him to sign the guaranties. (*Id.* at ¶¶ 9-12 & 19.)

3.   In 2007, U.S. Bank vice president Thomas Lee allegedly represented to Wesley that Polyphase was in "a strong financial position with good cash flow and that the Revolving Note was in good standing." (*Id.* at ¶ 20.)

4.   U.S. Bank fraudulently induced Wesley into believing that his Specific Transaction Guaranty, which was limited to $300,000, completely replaced all of the previous guaranties that he signed, thus limiting his liability as a guarantor to $300,000. (*Id.* at ¶¶ 22, 26, 32.)

None of these allegations gives Wesley a valid defense.

      **1.**     **Wesley Expressly Relieved U.S. Bank of Any Obligation to Advise Him About Polyphase's Financial Condition, and U.S. Bank Had No Legal Duty to Advise Wesley In Any Event**

Wesley's claim that U.S. Bank wrongfully failed to disclose information about Polyphase's financial condition runs headlong into two problems: first, Wesley <u>expressly relieved</u> U.S. Bank of any obligation to disclose such information to him, and he did so <u>in writing</u>; second, even if Wesley had not specifically relieved U.S. Bank of any such duty, U.S. Bank had no such duty in the first place.

      **a.**     **Wesley expressly relieved U.S. Bank of any obligation to advise him about Polyphase's financial condition**

In the written guaranties that Wesley executed, he made the following representations and promises to U.S. Bank:

    (i)    he "had the opportunity to examine the records, reports, financial statements, and other information relating to the financial condition of [Polyphase]";

    (ii)    he "relied solely upon investigations of [Polyphase's] financial condition conducted by [himself] or [his] authorized representative in deciding to execute [the] Guaranty; and

    (iii)    he or his authorized representative "shall continue to independently review, monitor, and investigate the financial condition of [Polyphase] while [the] Guaranty is in effect."

(Ex. J at p.1, § 5 & p.3, § 5.) Wesley also made the following representation:

> **[Wesley] specifically relieves the Bank of any duty, obligation, or responsibility of any nature whatsoever to advise [Wesley] of any change in [Polyphase's] financial condition.**

(*Id.* (original emphasis).)  Wesley subsequently signed <u>six</u> Reaffirmations of Guaranty— the latest in March of 2007—in which he expressly re-affirmed that he had "reviewed

[Polyphase's] financial condition prior to executing this Reaffirmation; and specifically relieves the Bank of any obligation to advise [him] of [Polyphase's] financial condition, or any changes in [Polyphase's] financial condition in the future." (Ex. J at 5-10).

Because Wesley specifically agreed in his guaranties to "relieve" U.S. Bank of "any duty, obligation, or responsibility of any nature whatsoever" to tell him about Polyphase's financial condition (and also promised to investigate Polyphase's financial condition for himself), he cannot avoid performing his promises on the ground that U.S. Bank failed to advise him of Polyphase's financial condition.

### b.   U.S. Bank had no duty to advise Wesley about Polyphase's financial condition in the first place

Even if he had not specifically relieved U.S. Bank of any duty to advise him about Polyphase's financial condition, Wesley cannot shirk his obligations based on U.S. Bank's alleged failure to disclose information about Polyphase because U.S. Bank had no legal duty to do so in the first place.

Under Minnesota law, banks do not owe even their customers (and remember that Wesley was not a customer of U.S. Bank) a duty to counsel them unless a "special circumstance" exists, such as a confidential relationship between the bank and the customer, or where the bank has special knowledge to which the customer does not have access. *See Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972); *see also Boubelik v. Liberty State Bank*, 553 N.W.2d 393, 400 (Minn. 1996), *overruled on other grounds by Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000).

Judge Montgomery recently held that a bank has a duty only to disclose

information that is "peculiarly within" the bank's knowledge, meaning knowledge that others cannot obtain. *Am. Bank of St. Paul v. TD Bank, N.A.*, No. 09-2240, 2011 WL 1810643, *4 (D. Minn. May 9, 2011) (emphasis added); *see also Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 821 (8th Cir. 2006) (Minnesota law imposes duty of disclosure only when "one party has special knowledge of material facts to which the other party does not have access") (emphasis added). Judge Montgomery started with the Minnesota Supreme Court's decision in *Boubelik*, which held that a bank has no duty to disclose "readily ascertainable" information, which includes information that can be obtained from the public record or the debtor itself. *Boubelik*, 553 N.W.2d at 400. Judge Montgomery explained that under this rule, "readily ascertainable" information also included knowledge obtained from subscription-only databases and even from private investigators. *Am. Bank of St. Paul*, 2011 WL 1810643, at *4-5. She emphasized that only information that others could not get access to counts as information that is "peculiarly within" the bank's knowledge. *Id.*

In a similar case dealing specifically with guarantors (sureties), the California Supreme Court held that banks do not owe "an absolute duty to the surety to disclose, without request by the surety, all facts within its knowledge which may materially affect the surety's risk." *Sumitomo Bank of Cal. v. Iwasaki*, 447 P.2d 956, 960 (Cal. 1968). This is particularly true where the surety or guarantor assumed the risk at the debtor's request, as the bank may assume that the guarantor obtained the relevant information about the risk from the debtor himself. *Id.* at 961.

In this case, no special circumstances existed that gave U.S. Bank a duty to

disclose any information to Wesley regarding Polyphase's finances. Wesley asserts that U.S. Bank possessed financial reports, knowledge of Polyphase's past loans, and knowledge of judgments against Polyphase, including for past-due taxes. (Dkt. 10 at ¶¶ 1, 5 & 7.) But if information can be obtained from the debtor itself, as information about finances and financial reports surely can, the information is not "peculiarly within" the bank's knowledge, and the bank has no legal duty to disclose it. *Boubelik*, 553 N.W.2d at 400; *Am. Bank of St. Paul*, 2011 WL 1810643, at *4-5. This is especially true when Wesley represented to U.S. Bank in writing that he had an opportunity to review all of Polyphase's financial information, and would <u>continue</u> to review that information and "monitor and investigate" Polyphase's financial condition. (Ex. J at p.1, § 5 & p.3, § 5.) And judgments and past-due taxes against Polyphase are a matter of public record, and clearly are not "peculiarly within" U.S. Bank's knowledge.

### 2. Alleged Fraud Committed By Frances and Timothy Does Not Nullify Wesley's Contracts With U.S. Bank

Wesley makes the unusual argument that because his mother and brother defrauded him, he should not have to perform his obligations to <u>U.S. Bank</u>. The argument that you can be excused from performing your contract with a party because of <u>someone else's</u> fraud is not just unusual, it is wrong as a matter of law. It is well settled that when a principal obligor has induced his surety or guarantor to sign an instrument by false or fraudulent representations, such misrepresentations may not be set up by the surety or guarantor as a defense to an action on the guaranty unless the lender had notice of, or participated in, such fraud. *Standard Surety & Casualty Co. v. Olson*, 150 F.2d 385, 387

(8th Cir. 1945) (Minnesota law); *see also Watkins Prods., Inc. v. Butterfield*, 144 N.W.2d 56, 57 (Minn. 1966) (well-established in Minnesota that misrepresentations by the principal do not release a surety from his contractual obligations to the assured obligee); *Neefus v. Neefus*, 296 N.W. 579, 581 (Minn. 1941) (fraud by principal that induces surety to execute it is not a defense in an action against the surety); *Schlozer v. Heckeroth*, 219 N.W. 921, 922 (Minn. 1928) (debtor's false representations to guarantors are not imputable to the obligee). The result is the same under California law. *See Lewin v. Anselmo,* 65 Cal. Rptr. 2d 682, 686 (Cal. Ct. App. 1997). Thus, Frances's and Timothy's alleged fraud do not excuse Wesley from performing his obligations to U.S. Bank. Their fraud would give Wesley a claim against <u>them</u>, not U.S. Bank.

### 3.    U.S. Bank's Alleged Affirmative Representations Do Not Establish a Fraud Defense

Wesley also asserts in his Amended Answer that that Thomas Lee of U.S. Bank told him that Polyphase was in a "strong financial position with good cash flow." (Dkt. 10 at ¶ 20). But even assuming that Mr. Lee made such a statement, Wesley cannot rely on it as a defense to performing his guaranties, for several reasons.

First, Wesley expressly agreed in his guaranties to rely only on his own investigation of Polyphase's financial position. As U.S. Bank pointed out above, Wesley promised in Section 5 of each guaranty that he signed that he "relied solely upon investigations of [Polyphase's] financial condition conducted by [him] or [his] authorized representative in deciding to execute this Guaranty." (Ex. J at 1, § 5 & 3, § 5.) Because Wesley expressly disavowed any reliance on anything other than his own investigation of

Polyphase's affairs, and did so in writing, he cannot prove reasonable reliance on U.S. Bank's alleged statements as a matter of law. *See Ellering v. Sellstate Realty Sys. Network, Inc.*, --- F. Supp. 2d ---, 2011 WL 2730919, at *9 (D. Minn. 2011) (Kyle, J.) (party cannot establish reasonable reliance on statements that contradict written representations); *Pacific State Bank v. Greene*, 110 Cal. App. 4th 375, 389-90 (Cal. Ct. App. 2003) (same).

Second, and related, every guaranty that Wesley signed contains a merger clause that provides:

> **IMPORTANT: READ BEFORE SIGNING. * * * NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. * * * THIS NOTICE SHALL ALSO BE EFFECTIVE WITH RESPECT TO ALL OTHER CREDIT AGREEMENTS NOW IN EFFECT BETWEEN GUARANTOR AND THE BANK, WHICH OCCURS AFTER RECEIPT BY GUARANTOR OF THIS NOTICE, MAY BE MADE ONLY BE ANOTHER WRITTEN INSTRUMENT. ORAL OR IMPLIED MODIFICATIONS TO SUCH CREDIT AGREEMENTS ARE NOT ENFORCEABLE AND SHOULD NOT BE RELIED UPON.**

(Ex. J at 2, § 10 & 4, § 10 (original capitalization and boldface).) The admonitions that "no other terms or oral promises not contained in this written contract may be legally enforced" and that oral modifications to the guaranties "are not enforceable and should not be relied upon" mean what they say. Minnesota and California enforce such merger clauses. *See, e.g.*, *Wessels v. Nat'l Med. Waste*, 65 F.3d 1427, 1435 (8th Cir. 1995); *Lonely Maiden Prods., LLC v. Golden Tree Asset Mgmt.*, 201 Cal. App. 4th 368, 376 (Cal. Ct. App. 2011). There is no reason for the Court to decline to enforce the merger clause in this case.

Third, Mr. Lee's alleged representation is too general in nature to be fraudulent as a matter of law. "[N]either opinions nor statements that are general and indefinite are representations of fact that will support a claim for fraudulent misrepresentation." *Grace Capital, LLC v. Mills*, No. A09-1857, 2010 WL 3396817, *4 (Minn. Ct. App. Aug. 31, 2010) (citing *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W2d 732, 747 (Minn. 2000)). In *Grace*, the plaintiff debtor made several representations to a potential guarantor about its financial condition, including that it had "lots of new clients and new deals" and that it was "growing its funds and had all the money it needed in place to do many other deals." *Id.* The court held that these "general representations" did not rise to the level of specificity needed to support a fraud claim. *Id.*; *see also Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 256 (Cal. Ct. App. 2007) (to be actionable, representations must be more than "puffery" and nonactionable opinion).

Thus, even assuming that Mr. Lee made the single representation that Wesley alleges, the representation fails as a matter of law to give Wesley an excuse to not perform his guaranties.

> **4.    Minnesota Statutes and the Express Terms of the Trust Guaranty and Trust Pledge Preclude Arguments That These Contracts Replaced All Prior Guaranties**

Wesley's final fraud-based defense is that U.S. Bank tricked him into thinking that the Trust Guaranty that he signed (which secured only the Term Note and had a dollar cap) replaced all of his <u>personal</u> guaranties. (*See* Dkt. 10 at ¶¶ 22, 26 & 32.) In essence, he asserts that U.S. Bank agreed to surrender guaranties securing nearly $2 million in debt for a guaranty securing only $300,000 in debt. The argument fails the test of

common sense, but more importantly, it fails the test of law, even if Wesley is right that U.S. Bank promised him such a thing.

First, Minn. Stat. § 513.33 provides that a debtor may not bring an action on a credit agreement "unless the agreement is in writing, expresses consideration, sets forth relevant terms and conditions, and is signed by the creditor and the debtor." Section 513.33 applies to affirmative defenses, including specifically those asserted by guarantors against creditors. In *BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 902 (Minn. Ct. App. 2010), the court held that several of a guarantor's affirmative defenses failed as a matter of law because they relied on alleged oral agreements that did not meet the requirements of § 513.33. *Id.* at 903. That is the case here. Wesley has nothing in writing from U.S. Bank releasing him from his personal guaranties. He alleges only an oral release of those guaranties. That is exactly the kind of thing that Section 513.33 was enacted to abolish.

Second, where an alleged oral representation contradicts the written terms of a contract, relying on the representation is unreasonable as a matter of law. *See Ellering*, --- F. Supp. 2d ---, 2011 WL 2730919, at *9; *Pac. State Bank*, 110 Cal. App. 4th at 389-90. Practically <u>every</u> document that Wesley signed contradicts his argument on this score. Every guaranty that he signed contains a merger clause that specifically provides (in bold and capital letters, no less) that no oral promises not contained in the written guaranty may be enforced. (Ex. J at 2, § 10 & 4, § 10.) And both the Trust Pledge and Trust Guaranty contain similar language. The Trust Guaranty states that all obligations of the guarantor "are intended to supplement each other" and "all terms will be cumulative."

20

(Ex. K at 3.) And the Trust Pledge states that "the effect of any earlier or later security agreement by Debtor shall be cumulative," and "all security agreements by Debtor shall be construed to provide Bank with the broadest possible scope and amount of secured obligations." (Ex. G at 6.) These provisions defeat Wesley's argument that the limited Trust Guaranty replaced all of his prior guaranties and reaffirmations of those guaranties.

Finally, at no time did Wesley send notice to U.S. Bank of the termination of any of the guaranties he now purports to have been superseded. *See* Ex. J at 2, § 7 & 4, § 7 (providing for revocation of guaranty); *Minnesota Fed. Sav. & Loan Ass'n v. Cent. Enterprises of Superior, Inc.,* 311 Minn. 46, 51 (Minn. 1976) (enforcing personal guarantee upon finding that at no time during the relevant period did the guarantor send notice of termination of his guaranty to the bank).

In short, Wesley's argument that U.S. Bank said that it would accept a more limited guaranty to supersede a variety of broader guarantees not only makes no sense, it is legally incorrect. Thus, Wesley's argument does not allow him to escape his guaranties.

### B.    Mistake (Second Affirmative Defense)

For his second affirmative defense, Wesley alleges that he shouldn't have to perform his guaranties because of "either a mutual mistake by the parties or a unilateral mistake made by the Defendants in entering into the guaranties. . . ." (Dkt. 10 at ¶ 34.) Neither mutual nor unilateral mistake gives Wesley a legally-valid defense.

First, Fed. R. Civ. P. 9(b) requires a party to "state with particularity the circumstances constituting fraud <u>or mistake</u>" (emphasis added). Wesley has done nothing

of the sort. He pleads mistake in conclusory fashion, and never explains the nature of the mistake and why it supports the legal defense of mistake. Wesley's mistake defense should be rejected on that basis alone.

But Wesley's mistake defenses also fail as a matter of law. *BankCherokee* specifically holds that the defenses of unilateral and mutual mistake fall within Minn. Stat. § 513.33, and are therefore barred where (as here) they are based on an alleged unwritten credit agreement. *BankCherokee*, 779 N.W.2d at 902. Section 513.33 alone bars Wesley's mistake defenses as a matter of law.

And his mistake defenses would fail even if Section 513.33 did not bar them as a matter of law. Start with mutual mistake, which allows reformation of a contract only when "both parties agree as to the content of the document but that somehow through a scrivener's error the document does not reflect that agreement." *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980). The party asserting mutual mistake must prove it by evidence which is "clear and consistent, unequivocal and convincing." *SCI Minnesota Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011); *see also Metro Office Parks v. Control Data Corp.*, 205 N.W.2d 121, 124 (Minn. 1973); *Dictor v. David & Simon, Inc*., 130 Cal. Rptr. 2d 588, 599 (Cal. Ct. App. 2003) ("[A] party must present clear and convincing evidence that the agreement as written does not express the true intention of the parties and that there was a mutual mistake."). Wesley has <u>no</u> evidence establishing that <u>U.S. Bank</u> was mistaken about the content of the guaranties that Wesley signed, or that the written documents do not reflect U.S. Bank's understanding of the agreement, much less "clear and consistent,

unequivocal and convincing" evidence of it. *Id.* And in case there were any doubt on this score, U.S. Bank has submitted testimony from Thomas Lee of U.S. Bank, who has responsibility for the Polyphase loan, that he (on behalf of U.S. Bank) was not mistaken about the contents of the documents that Wesley signed, and that the documents reflect U.S. Bank's understanding that Wesley would continue to be bound by the guaranties that he signed, even after the Trust Guaranty was executed. (Lee Decl. ¶ 14.) Thus, Wesley's mutual-mistake defense fails as a matter of law and undisputed fact.

The same is true of Wesley's unilateral-mistake defense. It too must be proven through evidence that is "clear and consistent, unequivocal and convincing." *SCI Minnesota*, 795 N.W.2d at 865. Unilateral mistake requires more than just saying "I made a mistake in entering into that contract." Many contracts would be unenforceable if that is all that it took, as parties frequently regret their contractual bargains. Instead, a party alleging unilateral mistake must show that his contracting partner <u>knew</u> that he was "laboring under a mistake" in entering into the contract. *Schoenfeld v. Buker*, 114 N.W.2d 560, 566 (Minn. 1962). Again, Wesley has no such evidence (much less "clear and consistent, unequivocal and convincing" evidence) of that, and Mr. Lee's testimony suffices to show that U.S. Bank had no idea that Wesley incorrectly thought that, despite all the warnings in the guaranties that he signed, he would be relieved of his obligations once the Trust Guaranty was signed. *See also R & B Auto Center, Inc. v. Farmers Group, Inc.,* 140 Cal. App. 4th 327, 382 (Cal. App. 4th Dist. 2006) ("A written contract is presumed to express the parties' actual intention, and the party seeking reformation bears the burden by clear and convincing evidence to overcome that presumption."); *Norwest*

*Mortgage, Inc. v. State Farm Fire & Casualty Co.,* 97 Cal. App. 4th 571, 581 (Cal. App. 4th Dist. 2002).

And the plain language of the guaranties is surely not irrelevant to this discussion. When contractual language is clear and unambiguous, it precludes a claim of mistake, because a party cannot legitimately be mistaken with respect to clear contract language. *See Nicholson v. Univ. of Minnesota Fed. Credit Union*, No. A06-652, 2007 WL 331321, at *4 (Minn. Ct. App. Feb. 6, 2007) (no mutual mistake when lease was clear).

In short, Wesley's mistake defenses fail because he failed to plead them with the particularity that Rule 9(b) requires, and because they are legally insufficient in any event.

**C.    "Meeting of the Minds" (Third Affirmative Defense)**

"Meeting of the minds" is not a recognized affirmative defense, and that is reason enough to reject it as a matter of law. To the extent that Wesley intends "meeting of the minds" to be another way to articulate his mistake defenses, it fails for the same reasons that his mistake defenses fail. *BankCherokee* lists "meeting of the minds" among the defenses that Minn. Stat. § 513.33 bars. *BankCherokee*, 779 N.W.2d at 902. And "meeting of the minds" is not a valid legal theory in any event when the language of a contract is clear. Minnesota follows the objective theory of contracts, under which "an outward manifestation of assent is determinative, rather than a party's subjective intention." *Speckel by Speckel v. Perkins*, 364 N.W.2d 890, 893 (Minn. App. 1985). According to the Supreme Court of Minnesota:

[T]he law imputes to a person, who has as a party to a contract

> embodied therein all its terms and conditions whether as offeror or
> offeree, an intention corresponding to the reasonable meaning of his
> words and actions. In *Benedict v. Pfunder*, 183 Minn. 396, 237
> N.W.2 [(Minn. 1931)] we held that <u>it is not the subjective thing
> known as the meeting of the minds, but the objective thing,
> manifestation of mutual assent, which is essential to the making of a
> contract</u>."

*Markmann v. H.A. Bruntjen Co.*, 81 N.W.2d 858, 862 (Minn. 1957) (emphasis added). In

other words, it is legally insufficient for Wesley to say that "his mind didn't meet with

U.S. Bank's," because that would destroy the objective theory of contracts in Minnesota.

Minnesota law imputes to Wesley "an intention corresponding to the reasonable meaning

of his words and actions"—*i.e.*, that he will honor his clear contractual obligations. Thus,

Wesley's "meeting of the minds" defense fails.

### D.    Promissory and Equitable Estoppel (Fourth Affirmative Defense)

Wesley's estoppel defenses are necessarily based on the allegation that he entered

into an unwritten agreement with U.S. Bank whereby all prior guaranties that he executed

were superseded by the Trust Guaranty. But *BankCherokee* specifically held that "an oral

promise that constitutes a 'credit agreement' under section 513.33 cannot be enforced

under a theory of promissory estoppel." *BankCherokee*, 779 N.W.2d at 903 (affirming

summary judgment on estoppel defenses); *see also Grueling v. Wells Fargo Home

Mortgage*, 690 N.W.2d 757, 761-62 (Minn. App. 2005).

Wesley's estoppel defenses also fail under California law. *Stewart v. Preston

Pipeline, Inc.*, 134 Cal. App. 4th 1565, 1588 (Cal. Ct. App. 2005), held that "it is well

established, in the absence of fraud, overreaching, or excusable neglect, that one who

signs an instrument may not avoid the impact of its terms on the ground that he failed to

read the instrument before signing it." *Id.* Wesley cannot claim mistake or a lack of a

meeting of the minds because, had he read the Trust Guaranty, he would have known that

the terms of the Trust Guaranty directly contradict the representations on which he now

claims to have relied.

In addition, Wesley agreed to the following when he executed the Reaffirmation

of Guaranties on March 14, 2007:

> [Wesley] hereby expressly releases and discharges [U.S. Bank] …
> from any and all claims, actions, and liabilities of any kind or nature
> that [Wesley] or any one claiming through or under him ever had or
> may now have, whether now known or hereafter discovered, arising
> out of or in any way relating to the lending relationship between
> Bank and [Polyphase] or [Wesley], the Guaranties or any course of
> conduct or obligations prior to the date of this instrument. [Wesley]
> acknowledges and agrees that he has received the advice of
> independent counsel selected by him or the opportunity to obtain
> such advice, before entering into this instrument, and has not relied
> upon Bank or any of its officers, directors, employees, agents or
> attorneys concerning any aspect of the instrument.

(Ex. J at 10) Thus, Wesley released any claims or defenses arising from alleged

misrepresentation in connection with his guaranties. *See also Rambus Inc. v. Hynix

Semiconductor Inc.*, 629 F. Supp. 2d 979, 1016-17 (N.D. Cal. 2009) (holding that

defendant—a sophisticated actor— could not reasonably rely on promises "beyond those

set forth in the language" of the agreement).

### E.    Lack of Consideration/Inadequate Consideration (Fifth Affirmative Defense)

The only consideration necessary for a guaranty is the "detriment suffered" by the

creditor in extending credit to the debtor; the guarantor need not receive a benefit.

*Southdale Ctr., Inc. v. Lewis*, 110 N.W.2d 862, 857 (Minn. 1961) (citation omitted); *see*

*also Beverly Hills Nat'l Bank v. Glynn*, 267 Cal. App. 859, 867 (Cal. Ct. App. 1968) (loaning of money to debtor or forbearance to collect on previously-incurred obligations constitutes consideration for guaranty). This is in line with the general rule that "valuable consideration may consist of some benefit accruing to one party <u>or some detriment suffered by the other</u>." *Estrada v. Hanson*, 10 N.W.2d 223, 225 (Minn. 1943) (emphasis added). Indeed, "the tendency is to emphasize the detriment to the promisee." *Id.*

Wesley expressly acknowledged in his guaranties that he provided the guaranties "in consideration of certain financial accommodations" granted by U.S. Bank to Polyphase and "to induce U.S. Bank N.A. . . . to extend or continue credit" to Polyphase. (Ex. G at 1; Ex. J at 1, 3). And defendants have admitted that U.S. Bank granted that credit to Polyphase. (Dkt. 1 at ¶¶ 9, 12; Dkt. 10 at ¶¶ 9, 12; Dkt. 34 at ¶ 2.) That is all that is necessary to constitute consideration. *See Southdale*, 110 N.W.2d at 862-63; *Estrada*, 10 N.W.2d at 225; *Beverly Hills Nat'l Bank*, 267 Cal. App. at 867. Thus, Wesley's argument that the guaranties lacked consideration is legally incorrect.

### F.    Breach of the Implied Covenant of Good Faith and Fair Dealing (Sixth Affirmative Defense)

Wesley alleges that he should not have to perform his obligations under his guaranties because U.S. Bank "was the first breaching party" by breaching its duty of good faith and fair dealing.  (Dkt. 10 at ¶ 38.)

The only example of U.S. Bank's alleged breach that Wesley offers is his allegation that U.S. Bank failed to tell him that Polyphase was in material breach of one or more of its covenants under the 2003 loan agreement. (*Id.*)  But as U.S. Bank

explained earlier, Wesley's guaranties provided that he "specifically relieve[d] the Bank of any duty, obligation, or responsibility of any nature whatsoever to advise [Wesley] of any change in [Polyphase's] financial condition." (Ex. J at 1, § 5 & 3, § 5.) "In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 503 (Minn. 1995). Thus, a party claiming a breach of the duty must prove that the other party "acted in bad faith <u>in relation to an underlying contractual duty</u>." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 880 (8th Cir. 2010) (emphasis added). Because Wesley's contract expressly <u>relieved</u> U.S. Bank of any duty to tell him about Polyphase's financial condition, U.S. Bank had no contractual duty to do so, and therefore could not violate the duty of good faith by failing to do so. In other words, there is no claim of bad faith as a matter of law when a party failed to do something that its contract expressly said it didn't have to do. *See Larson v. Vermillion State Bank*, 567 N.W.2d 721, 723 (Minn. Ct. App. 1997) (bank does not violate duty of good faith as a matter of law when it acts in accordance with its contractual rights). That is because the duty of good faith and fair dealing is an <u>implied</u> contractual duty, and it cannot trump <u>express</u> provisions in a contract. Indeed, the Supreme Court of California has remarked that it is "aware of no reported case in which a court has held that the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement. On the contrary, as a general matter, implied terms should never be read to vary express terms." *Carma Developers Cal., Inc. v. Marathon Dev. California, Inc.*, 826 P.2d 710, 728 (Cal. 1992).

28

In addition, a party breaches the covenant of good faith and fair dealing only when it unjustifiably hinders the other from performing under a contract. *Hennepin Cnty*, 540 N.W.2d at 502; *see also Ladd v. Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1306 (Cal. Ct. App. 2010). Wesley has no evidence that U.S. Bank <u>hindered</u> his ability to perform his obligations under his guaranties. Thus, Wesley's defense fails both on the law <u>and</u> the facts.

### G.    Increased Exposure to Risk (Seventh Affirmative Defense)

"Increased exposure to risk" is not a valid affirmative defense. (*See* Dkt. 10 at ¶ 39.) And in any event, Wesley expressly acknowledged in his reaffirmed guaranties that U.S. Bank could increase its lending to Polyphase without giving him notice, thus increasing his "exposure to risk." (Ex. J at 1, 3, 10.) Thus, Wesley has waived this defense to the extent that it even existed in the first place.

### H.    Unclean Hands and "Inequitable Conduct" (Eighth Affirmative Defense)

Another one of Wesley's 19 affirmative defenses is that U.S. Bank's silence regarding Polyphase's finances warrants application of the doctrine of "unclean hands." (Dkt. 10 at ¶ 40.) And it is another affirmative defense that fails for legal reasons and on the plain language of the guaranties that Wesley signed.

As U.S. Bank has repeatedly pointed out, Wesley's guaranties provided that he "specifically relieve[d] the Bank of any duty, obligation, or responsibility of any nature whatsoever to advise [Wesley] of any change in [Polyphase's] financial condition." (Ex. J at 1, § 5 & 3, § 5.) Because his defense of unclean hands and "inequitable conduct" is

based on U.S. Bank's alleged failure to do precisely what the guaranties said it didn't have to do, it fails as a matter of law under the language of the guaranties. The fact that U.S. Bank's conduct was expressly authorized by the guaranties also means that Wesley cannot prove (as he must) that U.S. Bank engaged in <u>unconscionable</u> conduct with "bad motive," or that the "result induced by [U.S. Bank's] conduct will be unconscionable either in the benefit to himself or injury to others." *Peterson v. Holiday Recreational Indus., Inc.*, 726 N.W.2d 499, 505 (Minn. Ct. App. 2007); *see also Farahani v. San Diego Cmty. College Dist.*, 175 Cal. App. 4th 1486, 1495-96 (Cal. Ct. App. 2011). Wesley's conclusory allegations of unclean hands based on U.S. Bank's alleged failure to disclose information that Wesley himself expressly agreed to independently investigate cannot be unconscionable as a matter of simple logic.

In addition, the doctrine of unclean hands bars only claims for equitable relief in Minnesota, not for damages. *See Foy v. Klapmeier*, 992 F.2d 774, 779 (8th Cir. 1993) (concluding that Minnesota Supreme Court would not recognize unclean hands in an action for damages); *Bieter Co. v. Blomquist,* 848 F. Supp. 1446, 1450-51 (D. Minn. 1994) (same) (citing *Thorem v. Thorem*, 246 N.W. 674, 675 (Minn. 1933)); *Hagberg v. Colonial & Pac. Frigidways, Inc*., 157 N.W.2d 33, 35 (Minn. 1968)). Under California law, the defense of unclean hands applies to both equitable and legal claims. *Pond v. Insurance Co. of North Am.*, 151 Cal. App. 3d 280, 290 (Cal. Ct. App. 1984). But where, as here, Wesley's allegation of fraud by U.S. Bank is itself foreclosed by the language of the guaranties he signed, the defense of unclean hands arising of the same allegations fails. *Cf. Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* No. C 07-03752 JSW,

2008 WL 4614660, at *10 (N.D. Cal. Oct. 16, 2008) (because summary judgment was appropriate against defendant's counterclaim for fraud, summary judgment was similarly appropriate against defendant's unclean-hands defense); *Joseph E. Di Loreto, Inc. v. O'Neill,* 1 Cal. App. 4th 149, 158 (Cal. Ct. App. 1991) (where "three affirmative defenses all essentially raise[d] the same issue", and there was no legal basis for relief on that issue, each defense failed as a matter of law).

## I.   Failure to Mitigate Damages (Ninth), Impairment of Collateral/Delay In Foreclosing (Sixteenth), and Failure to Properly Marshall Assets (Seventeenth Affirmative Defense)

Wesley expressly waived all rights to these mitigation and preservation defenses. The Minnesota Supreme Court "has expressed its commitment to enforcing the clear terms of a written guaranty." *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 382 n.3 (Minn. 1980). This extends to the enforcement of a guarantor's waiver of defenses, even where the guarantor has "bargained away practically every right which they now advance . . . ." *Midway*, 165 N.W.2d at 222; *see also* Cal. Civ. Code § 2856 (Deering 2011) (allowing guarantors to broadly waive defenses).

The same result follows here. In his guaranties, Wesley expressly waived "all rights of . . . diligence in collection or prosecution" and waived "any other defenses based on suretyship or impairment of collateral." (Ex. J at 1, § 3 & 3, §3.) He also expressly agreed that his "liability will not be reduced or discharged by the Bank's failure . . . to protect the value or condition of [the] collateral." (*Id.* at § 2.) Thus, Wesley's affirmative defenses related to the mitigation of damages or preservation of collateral fail as a matter of law.

## J.    Lack of Standing/Lack of Capacity (Tenth Affirmative Defense)

Wesley's tenth defense is baffling: lack of standing or capacity to sue. Because Wesley's guaranties expressly run to U.S. Bank, it is hard to imagine who <u>else</u> would have standing to sue on them. Standing requires only the existence of a concrete injury that is traceable to the challenged action and redressable by a court. *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010). U.S. Bank certainly has demonstrated that: Polyphase admits that it failed to repay the money that it owes U.S. Bank, and the guarantors concede that they have not repaid the money in Polyphase's stead. That is a concrete injury that is traceable to the defendants' breach of their guaranties and this Court can redress the injury by awarding damages. Indeed, U.S. Bank's standing is so clear that U.S. Bank assumes that the Wesley's invocation of the concept is the result of inadvertent error.

Wesley also asserts that U.S. Bank is a "foreign corporation" that needs, but does not have, a certificate of authority to transact business in Minnesota. Wrong on both counts. U.S. Bank is not a "foreign corporation," it is a national banking association organized under federal law, and as such is considered an "instrumentality of the [federal] Government." *U.S. Shipping Board Emergency Fleet Corp. v. Western Union Telegraph Co.*, 275 U.S. 415, 425-26 (1928); *see also Scott v. Federal Reserve Bank of Kansas City*, 406 F.3d 532, 535 (8th Cir. 2005) (characterizing national banks as "instrumentalities" of the United States). Thus, Minn. Stat. §333.03, which requires foreign corporations transacting business in this state to hold a certificate of authority, simply does not apply to U.S. Bank because it is not a foreign corporation (indeed, it is not a corporation of any

kind). And even if Minnesota <u>tried</u> to extend Section 333.03 to national banks, it would be stopped by the National Bank Act, which specifically provides that national banks are not subject to the visitorial powers of a state, such as state licensing requirements. 12 U.S.C. § 484(a); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13 (2007) And finally, even if Minnesota could have enacted a law requiring U.S. Bank to obtain a certificate to do business in Minnesota and resort to the courts of the State of Minnesota, and that avoided preemption under the National Bank Act, U.S. Bank would not need a certificate to resort to the <u>federal</u> court in this State.

### K.    Failure to Join Indispensible Parties (Eleventh Affirmative Defense)

Although Wesley raises an affirmative defense that U.S. Bank failed to join indispensable parties, he does not allege who those parties may be. Where a default of the underlying contract is established and the guarantee secures all liability, the creditor need only name the guarantors for complete relief. *See AEI Income & Growth Fund 24, LLC v. Parrish*, No. 04-2655, 2005 WL 713629, at *2 (D. Minn. Mar. 30, 2011) (Tunheim, J.); *Niederer v. Ferreira*, 189 Cal. App. 3d 1485, 1496 (Cal. Ct. App. 1987) (holder of rights to a note and guaranty need only name the obligor for relief). U.S. Bank has named <u>more</u> than the required parties to pursue repayment of Polyphase's obligations. Indeed, it has named all possible parties to the underlying loans and each and every guaranty. (*See* Ex. J at 2, 4; Ex. K at 4).

And in any event, failure to join indispensable parties is not a defense to liability, it is a procedural matter that is covered by Fed. R. Civ. P. 19 and amending the pleadings to join indispensable parties. In other words, there is no factual dispute to try, and

therefore no legal or factual basis for Wesley to avoid summary judgment.

### L.      Laches (Twelfth Affirmative Defense)

"The supreme court has consistently held that when an action is governed by a statute of limitations, the doctrine of laches does not apply." *Hebert v. City of Fifty Lakes*, 784 N.W.2d 848, 856 (Minn. App. 2010) (collecting cases). U.S. Bank's claims are based entirely on written contracts, and such claims are governed by the six-year statute of limitations for contract claims. *See* Minn. Stat. 541.05(1). Thus, as in *Hebert*, laches does not apply and is not a viable defense as a matter of law. *Hebert*, 784 N.W.2d at 856-57.

### M.      Failure to Provide Notice of Acceptance/U.S. Bank Did Not Sign the Guaranties (Thirteenth Affirmative Defense)

Wesley asserts that U.S. Bank cannot hold him to his obligations because U.S. Bank did not sign the individual guaranties.  (Dkt. 10 at ¶ 45.)  This defense is baseless for reasons that U.S. Bank discussed in Section II above in connection with Frances's and Timothy's identical argument. U.S. Bank refers the Court to that earlier discussion, which, along with *Bank of Santa Ana v. Molina*, 1 Cal. App. 3d 607, 616 (Cal. Ct. App. 1969), disposes of Wesley's argument as well.

### N.      Adequate Remedy At Law (Fourteenth Affirmative Defense)

All of U.S. Bank's contract claims are "legal" claims, so Wesley's "defense" in this regard surely does not apply to those claims. The only arguably "equitable" remedy that U.S. Bank pursues in this action is replevin, which is a statutory remedy to obtain possession of the brokerage account that Wesley pledged as collateral for the Term Note. *See Storms v. Schneider*, --- N.W.2d ---, 2011 WL 3426034, at *2 (Minn. Ct. App. Aug.

8, 2011). Thus, U.S. Bank is pursuing the only remedy available to it on that score; there is no alternative "remedy at law." Wesley also mistakenly alleges that U.S. Bank seeks attorneys' fees as a claim in "equity." (*See* Dkt. 10 at ¶ 46). In fact, U.S. Bank seeks the payment of attorneys' fees under Wesley's <u>contracts</u>, which specifically provide that U.S. Bank recovers its attorney's fees in litigation like this. (Exs. G, J, K).

### O.    Waiver (Fifteenth Affirmative Defense)

U.S. Bank's actions to collect against defendants also defeat Wesley's affirmative defense of waiver. Waiver is the voluntary surrender of a known right. *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 798 (Minn. 2004). To succeed on a waiver defense, Wesley must demonstrate that U.S. Bank (1) knew of the right in question, and (2) intended to waive that right. *Id*; *see also Gould v. Corinthian Colls., Inc.*, 192 Cal. App. 4th 1176, 1179 (Cal. Ct. App. 2011). Shortly after Polyphase defaulted on its obligations, U.S. Bank demanded payment from all defendants. (Ex. L.) When defendants failed to repay Polyphase's obligations, U.S. Bank filed this lawsuit. Because these facts are not in dispute, the Court should find that U.S. Bank has not waived its rights.

### P.    Failure to State a Claim (Eighteenth Affirmative Defense)

U.S. Bank discussed this "defense" in Section II above, as Frances and Timothy raised the same defense. Thus, U.S. Bank respectfully refers the Court to its earlier discussion, which takes care of Wesley's defense as well.

### Q.    Lack of Subject-Matter Jurisdiction

The Court ruled on this defense in its Memorandum Opinion and Order on

Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Dkt. 33), holding that the Court has subject-matter jurisdiction over this case. Shortly after the Court issued its opinion, the Eighth Circuit endorsed the Court's rationale in *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 709 (8th Cir. 2011), holding that "a national bank is a citizen only of the state in which its main office is located" (emphasis added). Therefore, Wesley's nineteenth—and final—defense fails as a matter of law.

## Conclusion

The Court should grant U.S. Bank summary judgment on all of its claims in this case and enter the judgment set forth in the proposed order that U.S. Bank submits with this brief.

Dated: December 30, 2011                FAEGRE & BENSON LLP


*s/ Charles F. Webber*
Charles F. Webber, #215247
Erin M. Verneris, #0335174
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
cwebber@faegre.com
everneris@faegre.com

Attorneys for Plaintiff
U.S. Bank National Association

fb.us.7316319.03

36